OPINION
Plaintiff, Roadway Express, Inc. ("Roadway"), appeals the judgment of the Court of Claims of Ohio finding that defendant and third-party plaintiff, Ohio Department of Transportation ("ODOT"), was not negligent in its maintenance of a public roadway.
On July 30, 1996, ODOT entered into a contract with third-party defendant, Kokosing Construction Company, Inc., ("Kokosing") to replace a culvert on Interstate 70 ("I-70") at the 123-mile marker in Licking County, Ohio. The project plans and specifications referenced in the contract were developed and designed by ODOT. Among other construction activities, the project entailed the removal of pavement in both the eastbound and westbound lanes and the construction of temporary travel lanes in both directions. The original plans and specifications called for the construction of a twelve-foot wide temporary westbound lane bordered on the south by a portable concrete barrier and on the north by a guardrail. On September 20, 1996, Kokosing requested a change in the plans that included narrowing the width of the temporary westbound lane. The request incorporated a drawing that depicted the new width of the temporary lane to be a total of thirteen feet, to include the pavement that supported the concrete barrier. However, the drawing depicted the usable width of the temporary lane as ten feet.[1] ODOT approved the change, which remained in effect at the time of the incident giving rise to the instant appeal.
Construction of the temporary westbound lane was completed on September 25, 1996. Approximately twenty-eight inches of shoulder area, comprised of a sand/limestone mixture, extended from the edge of the temporary travel lane to the guardrail. The speed limit was lowered through the entire project area to fifty-five miles per hour. To alert motorists to the lane shift, an illuminated message board was installed on the right side of the roadway, .2 miles west of the 124-mile marker, indicating "caution lane shift, 2000 feet ahead, narrow lane 11 feet, please drive safely."
Paul Haas, ODOT's project inspector, was responsible for seeing that the project was completed in accordance with ODOT's plans and specifications. Over the course of the project, Haas completed daily inspection reports detailing, among other things, a description of the daily work performed by Kokosing.
On September 25, 1996, Haas measured the width of the temporary westbound lane at eleven feet. On September 30, 1996, Haas noticed that a drop-off/rut had been created between the edge of the temporary westbound lane and the dirt shoulder as a result of the tires of cars and trucks drifting off the right edge of the paved road. Haas also noticed that the guardrail had sustained damage caused by trucks striking the guardrail while traveling on the shoulder. Haas reported his concerns to Harold Rayburn, Kokosing's project superintendent. With Haas's approval, Kokosing added 304 aggregate (crushed stone) to build up the existing shoulder, prevent further rutting, and to buttress the paved travel portion of the roadway. Haas inspected the roadway on September 30, 1996, and found Kokosing's work to be satisfactory. When Haas inspected the roadway at 7:30 p.m. on October 1, 1996, he did not notice any deterioration of the temporary westbound lane and otherwise determined the project to be in full compliance with ODOT's plans and specifications. Haas did not measure the width of the lane at any time after September 25, 1996.
At approximately 4:00 a.m. on October 2, 1996, Roadway's employee, Thomas Riemenschneider, was driving a Roadway tandem tractor-trailer[2]
westbound through the construction zone, when the right wheels of the truck's cab dropped off the edge of the roadway and sunk in the shoulder's loose dirt, causing the truck to leave the roadway, travel into a ditch and overturn. Riemenschneider was not injured in the accident; however, the truck sustained extensive damage. Riemenschneider testified that at the time of the accident, he was traveling with the flow of traffic, which was proceeding at the posted speed limit. He further testified that the road surface was dry and there were no adverse weather conditions. He also testified that he had driven through the construction zone several times prior to the accident and was well aware of the drop-off and the progressive deterioration of the roadway's edge.
Troopers Zeisler and Dawson from the Ohio State Highway Patrol arrived at the scene at approximately 4:15 a.m. and conducted an investigation. The officers made a series of lane width and drop-off/rut measurements at various points along the temporary right lane. The lane-width measurements varied from nine feet seven inches to nine feet eight inches and the drop-off/rut measurements varied from four and one-half inches to five inches. The nine feet eight inch lane-width measurement and the four and one-half inch drop-off/rut measurement were taken at the point the officers believed the truck left the roadway. In a report prepared after the investigation, the officers attributed Riemenschneider's accident to "unsafe speed," and found neither "pavement defect" nor "shoulder defect" to be contributing factors. Trooper Zeisler testified that because no lane-width measurements had been taken in the twenty-four hour period prior to the accident, she could not determine whether or not the truck had caused damage to the edge of the roadway during the accident.
Haas testified that he and ODOT field engineer, Rene Payette, took lane-width measurements at three different locations along the construction zone. These measurements revealed lane widths varying from nine feet eight inches to ten feet four inches. Although Haas was not certain of the exact point the truck went off the roadway, he testified that the nine feet eight inch measurement was taken closest to the accident location.
Glenn Fischer, Roadway's insurance adjuster, also took lane-width and drop-off/rut measurements after the accident. According to Fischer, his lane-width measurements ranged from a minimum of nine feet nine inches to a maximum of eleven feet; drop-off/rut measurements averaged six inches. Fischer was uncertain as to exactly where the truck went off the roadway. He further testified that he did not know whether or not the Roadway truck caused damage to the roadway edge as it went off the road.
On August 17, 1998, Roadway filed an amended complaint in the court of claims against ODOT. In count one, Roadway alleged that ODOT was negligent: (1) in failing to "supervise the construction site and ensure that its contractor was taking reasonable precautions to protect the safety of the public"; (2) in failing to "ensure that the passage through the construction zone was wide enough for vehicles to pass safely"; (3) in failing to "post signs warning traffic that the lane was too narrow for trucks to pass"; and (4) in failing to "remedy the dangerous drop-off on the guardrail side of the interstate." In count two, Roadway alleged that ODOT was negligent per se in failing to ensure that the construction project conformed to its own regulations. Specifically, Roadway asserted that ODOT deviated from the mandatory minimum safety standards set forth in ODOT's Location and Design Manual ("LDM") with regard to the width of the temporary travel lane. On May 5, 1999, ODOT filed a third-party claim for indemnification and/or contribution against Kokosing, alleging that Kokosing's negligence was the sole proximate cause of the accident.
The case was bifurcated, and a trial on the liability portion of the claim was held on January 24, 2000. At the close of the evidence, the court directed the parties to file proposed findings of fact and conclusions of law. On September 29, 2000, the court filed a decision and judgment entry. The court found that ODOT was not negligent per se because the standards set forth in the LDM regarding temporary lane width are advisory, not mandatory. As to Roadway's ordinary negligence claim, the court found that ODOT had met its duty to maintain the roadway in a reasonably safe condition for the driving public by posting signs warning of the lane shift, by reducing the speed limit in the construction zone, and by reasonably supervising and inspecting the work performed by Kokosing. The court further found that, even assuming that ODOT was negligent, Roadway was barred from recovery because Riemenschneider's comparative negligence was greater than the negligence of ODOT. The court relied upon the Ohio State Highway Patrol report in which "unsafe speed" was listed as the only factor contributing to the accident.
Roadway filed a timely appeal, advancing the following five assignments of error:
 [1.] The Court of Claims erred as a matter of law when it concluded that ODOT owed no greater duty to the motoring public than to inspect the project site and fix any known defects.
 [2.] The Court of Claims erred in concluding that ODOT was not negligent when the undisputed evidence at trial established that ODOT failed to exercise care in inspecting and correcting a clearly dangerous and defective temporary lane.
 [3.] The Court of Claims erred as a matter of law in failing to make any factual determination as to the negligence of ODOT's agent on the project, Kokosing Construction Company.
 [4.] The Court of Claims erred in concluding that the Roadway truck caused the pavement to break apart, thereby explaining the fact that the lane was nearly 1½ feet narrower than it should have been, when there was no evidence to support such a conclusion.
 [5.] The Court of Claims erred in concluding that the roadway driver was more negligent than ODOT when there was no evidence in the trial record to support such a conclusion.
By the first assignment of error, Roadway contends that the court of claims misconstrued the duty of care imposed by law upon ODOT. Specifically, Roadway argues that the court erred in concluding that ODOT's duty of care was limited to inspecting the work performed by Kokosing and remedying known defects discovered in the course of those inspections. Roadway argues that in so finding, the court essentially concluded that ODOT could delegate its statutory duty to maintain the highway in a reasonably safe condition to its contractor, Kokosing. Upon review of the court's decision, we find that Roadway mischaracterizes the court's statement. The court stated that, while ODOT is not an insurer of the safety of its highways, and cannot guarantee the same level of safety during a highway construction project as it can under normal traffic conditions, it "has a duty to maintain the system of highways free from unreasonable risk of harm by exercising ordinary reasonable care"; furthermore, the court must look at the totality of the circumstances to determine whether ODOT "acted in a manner to render the highway free from unreasonable risk of harm for the traveling public." It is well-established that this is the precise duty owed by ODOT to the traveling public under both normal traffic conditions and during highway construction projects. See, e.g., White v. Ohio Dept. of Transp. (1990), 56 Ohio St.3d 39, 42; Rhodus v. Ohio Dept. of Transp. (1990),67 Ohio App.3d 723, 729; Feichtner v. Ohio Dept. of Transp. (1995),114 Ohio App.3d 346, 354. The court simply recognized the fact that because ODOT did not actually perform any of the work on the construction project, its "duty to maintain the system of highways free from unreasonable risk of harm" involved supervision of the construction project, inspection of the work performed by Kokosing, and remedying defects discovered during the course of the inspections. Indeed, the court rejected ODOT's argument that its right to inspect the construction site did not make it responsible for any failure by Kokosing to properly maintain the temporary lane in a safe condition. Roadway's first assignment of error is not well-taken.
By the second and fourth assignments of error, Roadway contends that the court of claims erred in finding that ODOT did not breach its duty of care. In essence, Roadway argues that the court's decision was against the manifest weight of the evidence.
In determining whether the judgment of the court is against the manifest weight of the evidence, a reviewing court must be guided by the presumptions that the findings of the court are correct, as the trial judge "* * * is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. In C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus, the Ohio Supreme Court held:
 Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.
In order to establish actionable negligence, Roadway was required to establish by a preponderance of the evidence that ODOT owed them a duty of care, that ODOT breached that duty, and that Roadway suffered damages as a proximate result thereof. Lunar v. Ohio Dept. of Transp. (1989),61 Ohio App.3d 143, 146, citing Strother v. Hutchinson (1981),67 Ohio St.2d 282. As noted previously, it is well-established that ODOT has a general duty to maintain and repair state highways. White, supra; Rhodus, supra; Feichtner, supra. It is also well-settled that ODOT is not an insurer of the safety of the state's highways. Rhodus, supra, at 730. Thus, ODOT had a duty to conduct the repairs on I-70 in a reasonably safe manner. Roadway essentially contends that ODOT breached this duty "by permitting vehicles to travel along a perilously narrow highway alongside a steep depression."
The scope of ODOT's duty to ensure the safety of state highways is defined by the Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"), which mandates certain minimum safety measures. Leskovac v. Ohio Dept. of Transp. (1990), 71 Ohio App.3d 22. Furthermore, the construction contract in this case specifically incorporated ODOT's construction and material specifications and its LDM. In Perkins v. Ohio Dept. of Transp. (1989), 65 Ohio App.3d 487, this court considered the weight to be accorded the OMUTCD specifications in evaluating ODOT's duty to maintain safe highways. In Perkins, we determined that not all portions of the manual are mandatory, thereby leaving some areas within the discretion and engineering judgment of ODOT.
"The issue of whether an act constitutes a mandatory duty or a discretionary act determines the scope of the state's liability because ODOT is immune from liability for damages resulting from not performing a discretionary act." Gregory v. Ohio Dept. of Transp. (1995),107 Ohio App.3d 30, 33-34, citing Winwood v. Dayton (1988),37 Ohio St.3d 282. When the duty, or standard of care, is not detailed in ODOT's manual, "the proper standard should be that of a reasonable engineer using accepted practices at the time * * *." Lunar, supra, at 147.
Roadway's negligence per se claim concerned the standard set forth in Section 502 of ODOT's LDM. Section 502.22 provides:
 It is desirable to maintain lane widths at least equal to those on the existing facility. Where width reductions are necessary, widths should not be less than 10 feet, unless lane widths on the existing facility are less than 10 feet. * * *
 Channelizing device offsets, discussed in Section 502.14, should be provided in addition to lane widths whenever possible. (Emphasis added.)
Roadway does not assign as error the court's finding that ODOT did not violate the LDM and, thus, was not negligent per se in maintaining the westbound temporary travel lane at nine feet eight inches. As noted by the court "the word `should,' as used in section * * * 502.22 of the LDM, was not mandatory. Therefore, ODOT was not deprived of discretion to exercise its engineering judgment." (Decision at 5.) Roadway argues, nonetheless, that the nine foot eight inch temporary travel lane and the four and one-half inch drop-off/rut created a "clearly dangerous" condition and that ODOT's failure to correct this condition constituted a breach of its duty of care.
As noted previously, this court, in Feichtner, supra, discussed ODOT's duty to the traveling public in construction zones. This court recognized that ODOT cannot guarantee the same level of safety during a highway construction project as it can under normal traffic conditions. Id. In addition, we acknowledged that ODOT is, nonetheless, required to provide the traveling public with a reasonable degree of safety in construction zones by way of utilizing traffic control barrels, reducing the applicable speed limit, and erecting construction warning signs. Id. We further found that a court must look at the totality of the circumstances in determining whether ODOT's actions were sufficient to render the highway reasonably safe for the traveling public during the construction project. Id., see, also, Lumbermens Mut. Cas. Co. v. Ohio Dept. of Transp. (1988), 49 Ohio App.3d 129, 130.
In the instant case, the court found that the construction zone was clearly marked with an illuminated sign warning motorists to use caution; that the roadway narrowed; that a lane shift to the right was required upon entering the temporary travel lane; and that the speed limit was reduced to fifty-five miles per hour, and that such signage constituted a reasonable and acceptable method of assuring safe travel in the construction zone.
Furthermore, the court noted that ODOT had on duty at all times its project inspector, Paul Haas. Haas measured the temporary lane when construction was completed on September 25, 1996, at eleven feet. Furthermore, when he observed pavement deterioration and rutting problems on September 30, 1996, he recorded the problems, reported them to Kokosing's project superintendent, discussed possible solutions, and inspected and approved the repairs made by Kokosing. Although Haas did not physically measure the temporary lane after construction was completed on September 25, 1996, we cannot find that ODOT breached its duty of care by failing to do so. Haas testified that he inspected the project on a least a daily basis and recorded all noteworthy events in his daily reports. He further testified that between the time the repair was made on September 30, 1996, and the time of the accident on October 2, 1996, Haas did not observe any unsafe condition on the temporary travel lane. Indeed, Haas testified that he inspected the roadway at 7:30 p.m. on the night before the accident, noticed no deterioration of the westbound travel lane, and was otherwise satisfied that the project conformed to ODOT's plans and specifications. Moreover, Roadway offered no evidence, expert or otherwise, establishing that ODOT violated its own specifications or any provision of either the OMUTCD or LDM by failing to take more frequent lane-width measurements. Furthermore, Roadway has pointed to no authority, either statute or case law, suggesting that ODOT's duty to maintain a construction zone in a reasonably safe condition includes the duty to frequently measure the width of a temporary travel lane.
With regard to the drop-off/rut issue, we note that Roadway offered no evidence, expert or otherwise, establishing that the four and one-half inch drop-off/rut violated ODOT's plans and specifications or any of the provisions of either the OMUTCD or LDM or otherwise created an unreasonable risk of harm to the motoring public. In addition, we find that it would have been inefficient and hazardous to require ODOT to constantly repair rutting caused by tens of thousands of vehicles passing through the construction zone on a daily basis. Because of the impracticality and danger posed by such frequent repairs, the court could have reasonably found that placing warning signs and reducing the speed limit were the only feasible solutions. See Basilone v. Ohio Dept. of Transp. (Feb. 13, 2001), Franklin App. No. 00AP-811, unreported.
In addition, we note that there was evidence suggesting that Riemenschneider left the roadway for no other reason than inattention to the right edge line and unreasonable speed. In Stonerock v. Miller Bros. Paving (1991), 72 Ohio App.3d 123, 136, this court noted that "given the circumstances of any individual case, the operation of a motor vehicle, even if being driven below the posted speed limit, may be unreasonable given the circumstances which exist." Id at 136. We find the Ohio State Highway Patrol report's citation to "unsafe speed" and not "pavement defect" or "shoulder defect" as a factor contributing to the accident a very strong indicator that Riemenschneider's speed, whether fifty-five miles per hour or slightly below the posted speed limit, was unreasonably fast under the conditions, especially in light of Riemenschneider's testimony that he frequently traveled through the construction zone and was aware of the deteriorating condition of the edge of the roadway. See State Farm Auto. Ins. Co. v. Ohio Dept. of Transp. (June 8, 1999), Franklin App. No. 98AP-936, unreported.
Finally, we discern no error in the court's finding that the accident at issue may have caused a portion of the roadway edge to break off. Haas testified that portions of the roadway had been broken off as the result of trucks driving off the edge of the roadway. No evidence established the actual width of the temporary lane immediately prior to the accident. However, the evidence did establish that the condition of the temporary lane deteriorated after Haas left the construction site on October 1, 1996. Haas testified that when he left the construction site at 7:30 p.m., he observed no problem with the temporary lane. Riemenschneider testified that the right wheels of the truck's cab dropped off the edge of the roadway. None of the witnesses at trial could testify definitively that the Roadway truck did not tear away at the edge of the pavement when it left the pavement. From the foregoing evidence, the court could reasonably infer that the accident may have caused a portion of the roadway edge to break away, especially given the fact that the truck had tandem trailers.
Viewing the present facts under the totality of the circumstances, we find that the court's decision that ODOT was not negligent in its maintenance of the roadway at issue was not against the manifest weight of the evidence. Accordingly, the second and fourth assignments of error are not well-taken.
By the third and fifth assignments of error, Roadway argues, respectively, that the court erred in failing to make any findings with regard to Kokosing's alleged negligence and in finding that Riemenschneider was comparatively negligent. Because we have determined that ODOT was not negligent, issues regarding Kokosing's alleged negligence and Riemenschneider's comparative negligence as related to Roadway's cause of action against ODOT are moot, and we decline to address them. See App.R. 12(A)(1)(c).
For the foregoing reasons, the first, second and fourth assignments of error are overruled, and the third and fifth assignments of error are moot. Accordingly, the judgment of the Court of Claims of Ohio is hereby affirmed.
 _______________ PETREE, J.
KENNEDY and McCORMAC, JJ., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] As noted by the trial court, trial testimony was inconsistent as to the actual usable lane width of the temporary roadway. ODOT's witnesses initially testified that the reduced usable lane width was eleven feet. However, Adam Lanier, ODOT's project design engineer, reviewed the drawings submitted with the change order and concluded that the actual usable lane width was ten feet. Furthermore, the September 25, 1996 daily report completed by Paul Haas, ODOT's project inspector, states that the "required" width of the temporary lane was ten feet.
[2] Riemenschneider testified that the truck cab was eight-feet wide and each of the two trailers were eight feet six inches wide.